# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1998-KA-01507-SCT

*DARNELL BALDWIN*

*a/k/a BUBBA*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/20/1998 |
| TRIAL JUDGE: | HON. JOHN M. MONTGOMERY |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | RICHARD BURDINE |
| | PEARSON LIDDELL, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/23/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/13/2000 |

## BEFORE PRATHER, C.J., SMITH AND WALLER, JJ.

## WALLER, JUSTICE, FOR THE COURT:

### STATEMENT OF THE CASE

¶1. Darnell Baldwin was tried and convicted of capital murder in the Circuit Court of Lowndes County and sentenced to a term of life imprisonment without possibility of parole. He appeals to this Court raising three issues:

> **I. Whether the trial court erred in ruling that Ms. Anne Montgomery was qualified as an expert in DNA statistical analysis, and allowing her to testify regarding statistical analysis of the DNA evidence.**

**II. Whether the trial court erred when it denied the defendant a continuance to procure a population geneticist.**

**III. Whether the trial court erred when it admitted into evidence the oral statement of the defendant made to Lieutenant Eddie Coleman on April 12, 1996.**

## STATEMENT OF THE FACTS

¶2. Mary Elizabeth Dill ("Liz") was abducted from her home sometime during the night of April 5, 1996. Her husband, Bryan Dill, reported her missing shortly after 7 o'clock on the morning of April 6. Three days later, on the afternoon of April 9, 1996, her mutilated and partially decomposed body was found on a dirt road in rural Lowndes County, Mississippi.

¶3. Dr. Stephen Hayne, a pathologist for the Department of Public Safety and Medical Examiner's Office, performed an autopsy on the body. Liz's upper extremities (fingers, hands, and arms) showed signs of defensive posturing, indicating that she had attempted to protect herself from attack prior to her death. She also had seminal fluid in her vagina, which Dr. Hayne collected and sent for DNA testing. Dr. Hayne concluded that Liz had died as a result of a high velocity projectile which directly struck the back of her head and that the projectile was shot by a rifle from a range no closer than three feet. Her skin was removed over most of her face, neck, and chest area, from below the left breast, which was completely removed, over the right shoulder. Dr. Hayne testified the removal of the skin was performed with a sharp object following Liz's death.

¶4. The Lowndes County Sheriff's Department learned that Liz had visited the doctor on April 5, 1996, where she was treated for significant back injuries. She was prescribed three different medications, the combined effect of which would have made her drowsy and lethargic. Liz had sent her 15-month-old daughter, Taylor, to stay with her mother while she recovered.

¶5. Liz's husband, Bryan, left his wife at home alone and went to a cabin (commonly referred to as "the shack") that he and some of his hunting buddies rented. Bryan arrived at the shack around 8:30 or 9:00 p.m. on April 5, 1996, and did not leave until 5:30 the next morning. He and his friends cooked out and shared a keg of beer. The deputies interviewed the party attendees, learning that Darnell Baldwin and one of his brothers, Clint (also indicted, tried, and convicted of capital murder), arrived at the party in Baldwin's 1975 Monte Carlo and stayed for 15-20 minutes. One or both of the Baldwin brothers spoke to Bryan Dill while they were at the shack. Baldwin drove his 1975 Monte Carlo to the shack again in the early morning hours of April 6. Baldwin never left his car the second time he appeared at the shack and did not talk with Bryan Dill.

¶6. Having identified Baldwin as someone who had been at the shack, the deputies went to his home on April 9 to talk with Baldwin about the night of Liz's disappearance. During the interview the deputies noted that Baldwin was visibly shaken and that he was sweating, trembling, and chain smoking. Baldwin repeatedly refused the deputies' invitation to come to the Sheriff's Department for an interview, as well as the deputies' request to look inside the Monte Carlo car, which was parked in the yard. The deputies believed Baldwin's actions were suspicious. Unfortunately, after the deputies left Baldwin's house to arrange surveillance, Baldwin left in the Monte Carlo, and the Sheriff's Department was not able to locate the car until several months later.

¶7. On April 12, the deputies arrested Baldwin at his home for an unrelated armed robbery. After he was read his *Miranda* rights, Baldwin chose to talk to the Sheriff's Department. There was no evidence that the officers used threats, coercion, or force to make Baldwin talk. When asked the whereabouts of his car, he told the officers that his girlfriend had taken it to the Wal-Mart. Baldwin was handcuffed and remained on the premises while the deputies executed a search warrant of the residence. When no one returned with the car, the officers again questioned Baldwin about the location of the car. Baldwin offered to show the officers where his girlfriend may have taken the car. Over two hours after he was arrested and read his rights, Baldwin was placed in a patrol car with two officers who had not been present when Baldwin was advised of his right against self-incrimination. Baldwin was asked to direct the officers to the location of his car. He first directed the officers to some apartments, but the car was not present. The officers asked Baldwin which apartment his girlfriend lived in, and Baldwin replied that he was not sure and that maybe she lived in a house in the same general area to which he had led the deputies. After riding around in the vicinity for a short while, the officers abandoned their search for the car with Baldwin.

¶8. It was later learned that Baldwin had driven his car to his friend Richard Jones' house on April 10, 1996, claiming that he wanted his friend to look at the car because there was something wrong with it. The car remained parked at Jones' house until April 16 or 17, 1996, when Jones returned home to find the car gone. On April 17, 1996, Baldwin's lawyer telephoned the police and reported the car stolen. Over four months later on August 18, 1996, the car was found in Pickens County, Alabama. The car was completely burned from hood to trunk, including the tires, with only the hull remaining.

¶9. Lonnie Harris testified at trial that Baldwin told him that he had poured gasoline on the car and burned it. Harris was a fellow inmate at the Lowndes County Jail where Baldwin was imprisoned after his arrest. Harris further testified that Baldwin told him that Baldwin had raped, murdered, and "cut up" a woman and that the woman's husband had paid him $1,000 to do so.

¶10. The semen recovered by Dr. Hayne and the blood drawn from Baldwin were sent to a forensic DNA and molecular testing firm known as Gentest (now called Reliagene Technologies). At trial, Anne Montgomery, a molecular biologist employed by Reliagene, was qualified as an expert in molecular biology and DNA analysis. Montgomery testified that, after comparing the semen and the blood, she was unable to exclude Baldwin as the sperm donor. Montgomery further opined that it was 19 million times more likely that Baldwin was the sperm donor than any other individual of the African-American population. Stated in a more precise manner, of all of the members of the African-American population, the average occurrence of the genotype matching Baldwin's DNA is one in 19 million. *See Hughes v. State*, 735 So. 2d 238, 264-65 (Miss. 1999).

## STANDARD OF REVIEW

¶11. The trial court has discretion in determining whether an expert is qualified to testify. *Hall v. State*, 611 So. 2d 915, 918 (Miss. 1992); *Goodson v. State*, 566 So. 2d 1142, 1145 (Miss. 1990). This Court should not reverse the trial court's ruling unless it can be shown that the trial judge abused his discretion or that the expert was clearly not qualified. *Genry v. State*, 735 So. 2d 186, 198 (Miss. 1999).

¶12. This Court reviews the denial of a continuance under an abuse of discretion standard and will not reverse a denial unless manifest injustice has resulted from the failure to grant a continuance. *Johnson v. State*, 631 So. 2d 185, 189 (Miss. 1994).

¶13. A trial court is also given deference in the admissibility of an incriminating statement by a criminal defendant. In *Hunt v. State*, 687 So. 2d 1154, 1160 (Miss. 1996), this Court held that the defendant seeking to reverse an unfavorable ruling on a motion to suppress bears a heavy burden. The determination of whether a statement should be suppressed is made by the trial judge as the finder of fact. *Id.* "Determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence." *Balfour v. State*, 598 So. 2d 731, 742 (Miss. 1992); *Alexander v. State*, 736 So. 2d 1058, 1062 (Miss. Ct. App. 1999).

## DISCUSSION

### I. Whether the trial court erred in ruling that Ms. Anne Montgomery was qualified as an expert in DNA statistical analysis, and allowing her to testify regarding statistical analysis of the DNA evidence.

¶14. Generally, on a challenge to the admissibility of DNA evidence, a trial court will conduct a hearing pursuant to this Court's decision in *Polk v. State*, 612 So. 2d 381, 390 (Miss. 1992); such a hearing was held in this case. Under the test adopted in *Polk*, the Court should ask whether (1) there is a theory generally accepted in the scientific community which supports the conclusion that DNA testing can produce reliable results, (2) there are techniques capable of producing reliable results in DNA identification, and (3) in the case before the court, whether the testing laboratory perform generally accepted scientific techniques without error in the performance or interpretation of the tests. *Id.*

¶15. In *Hull v. State*, 687 So. 2d 708, 728 (Miss. 1996), this Court went one step further and addressed the issue of admissibility of statistical probabilities in DNA evidence. The Court concluded:

> if the witness can put the meaningfulness of a match in terms of strong or weak, then it is unreasonable to prevent the parties from putting on statistical evidence to show *how* strong or *how* weak the evidence is. Without this evidence, the ability of the jury to use this evidence may be diminished to such a degree as to be unhelpful to the trier of fact under Rule 703, or more prejudicial in that a jury may think it needs no evidence other than the "conclusion" that the defendant's DNA was found upon the victim's person. Accordingly, we hold that where the trial court finds that evidence of a DNA match is admissible as relevant, the court should also allow scientific statistical evidence which shows the frequency with which the match might occur in a given population.

The trial judge in this case followed the dictates of *Hull* in finding that the evidence of statistical probability was relevant and admissible in helping the trier of fact interpret the DNA evidence presented by Montgomery.

¶16. Baldwin's argument is, however, that Montgomery was not qualified to give those statistics. During the course of the *Polk* hearing, defense counsel argued that Montgomery could be qualified as an expert in molecular biology and DNA matching, but was not qualified to testify as an expert on the population statistics. Defense counsel specifically pointed out that Montgomery had used population databases created and validated by other statistical experts. Montgomery acknowledged that in her published scholarly articles in conducting forensic analysis of DNA such as for her testimony in the case sub judice, she had relied on other statistical experts for their opinions on the population studies and the associated linkages at issue in those studies. She, in essence, uses a "canned formula" and "crunches" the numbers to determine the DNA

profiling. Montgomery relied on population databases and statistics in her determination that it was 19 million times more likely that Baldwin was the sperm donor than any other individual of the African-American population.

¶17. The State pointed out that Montgomery regularly testified to the statistical probabilities of DNA matching using population statistics. Montgomery testified:

> In the early days, and I refer to the early '90s as the early days, we had limited genetic markers and there were limited populations studies so there were concerns about the population database issues. . . . . Now there is an exhaustive amount of scientific literature for the genetic markers we use in forensic science that have shown independent of each other these studies, these markers are valid. They do adequately represent given populations and can be used in estimating a DNA profile frequency.

In response to defense counsel's questioning of Montgomery's expertise, the prosecutor argued to the judge that:

> [w]hat [defense] counsel seeks to do is cast Ms. Montgomery or require that Ms. Montgomery fulfill the qualifications as a professional mathematics statistician. That is not what she is. She is a DNA analyst. A DNA analyst does some of that work. As she has testified, the numbers are out there. It's simply a matter of crunching those numbers. When a situation becomes more involved, what she has to do is consult a statistical expert. That does not make her any less of an expert or any less competent to express her opinion on these numbers that she crunches and has been recognized as an expert in crunching in 98 percent of the cases she's testified to. DNA analysis necessarily includes that testimony concerning the percentage of the match. Without such, it's meaningless.

¶18. The trial judge ruled that Montgomery was an expert in the fields of molecular biology and DNA analysis. He also stated that defense counsel's cross-examination during the hearing concerning her use of other experts' population statistics went more to Montgomery's credibility than competence to testify as an expert under M.R.E. 702. The judge therefore concluded that she would be able to testify about the population statistics or DNA frequency profile that she had calculated.

¶19. The trial judge did not abuse his discretion in determining that Montgomery was qualified as an expert in DNA analysis or that she was competent to testify as to the population statistics in this case. While Baldwin correctly concludes that an expert in DNA analysis is not an expert in population genetics or population statistics, it was not proved that Montgomery was testifying outside her field of expertise.

¶20. Rule 702 of the Mississippi Rules of Evidence states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." M.R.E. 702. In this case, Montgomery had specialized knowledge of DNA analysis to assist the trier of fact. In fact, she has testified as a DNA expert in over 100 cases and has given the population statistics in 98 percent of those cases. Further, Rule 703 provides that facts or data relied upon by the expert need not be admissible, as long as they are "of a type reasonably relied upon by experts in the particular field." M.R.E. 703. It is clear from the testimony and arguments presented that DNA experts in the routine course of their analysis use prepared population databases to determine the population frequency of a particular match, and testify to statistical probabilities based on those databases. For example, in *Hughes v. State*, 735 So. 2d 238, 264-68 (Miss. 1999), this Court addressed the issue

of DNA frequency profile. In that case, Montgomery also was qualified as an expert and testified to the population frequency of the DNA match. *Hughes* pointed out the logical fallacies and routine errors made by prosecutors and DNA experts in presenting population frequency profiles to jurors. Although the present case does not deal specifically with those types of issues, it is important to note that allowing Montgomery to testify to population frequency is not outside the scope of her expertise. Therefore, it was not an error or an abuse of discretion for the trial judge to accept Montgomery as an expert or to permit her to give her opinion of the population frequency profile.

¶21. The comment to M.R.E. 703 provides that the bases of opinions by experts are subject to cross-examination, which is an effective tool to challenge the facts or data relied upon by an expert. Baldwin had a court-appointed DNA expert, Dr. Stephen Case, to assist him with his case. While Dr. Case was able to aid Baldwin and his counsel in his vigorous cross-examination of Montgomery concerning the DNA match and the population frequency profile, the defense did not cross-examine Montgomery on the validity of the population databases on which she relied. Also, while Dr. Case was present at trial and seated at the defense table, Dr. Case was not called as a witness to refute the testimony of Montgomery. That decision was within the province of the defendant. In light of Montgomery and Dr. Case's similar fields of expertise and the routine use of the population databases that Baldwin hopes to challenge, it is likely that Dr. Case, using the same "canned" formulas as Montgomery, was unable to challenge Montgomery's conclusions to give a favorable outcome to Baldwin on the DNA evidence.

### II. Whether the trial court erred when it denied the defendant a continuance to procure a population geneticist.

¶22. Baldwin's second assignment of error is an extension of his first. Here Baldwin argues that he should have been granted a continuance in order to procure an expert to challenge the population statistics relied upon by Montgomery in making her population frequency conclusion. In his brief, Baldwin alleges that Dr. Stephen Case, the DNA expert chosen by the defendant and appointed by the court to aid in his defense, had no expertise in population genetics and was not able to assist Baldwin in preparation of his defense in the area of population genetics.

¶23. Baldwin alleges that *Hull* necessitates the admission of population statistics evidence. In *Watts v. State*, 733 So. 2d 214 (Miss. 1999), this Court specifically noted that it was not an abuse of discretion for a circuit court to allow evidence of DNA matching without requiring statistical analysis of the match (citing *Polk v. State*, 612 So. 2d 381, 390 (Miss.1992)).

¶24. In considering this assignment of error, it is important to note that the trial judge agreed that Baldwin could have another expert to address the population statistics, including the underlying data used to determine population frequency. Defense counsel requested the appointment of the additional expert on June 26, 1998. On June 29, 1998, at a hearing on the motion for continuance, the trial judge noted in his ruling that he had already agreed that Baldwin could have another expert. He further stated that defense counsel had assured him he would attempt to contact statisticians at Mississippi State University to assist counsel in cross-examination of Montgomery, but that counsel had made insufficient efforts to locate and obtain an expert. Nevertheless, the judge ruled that Baldwin would still be allowed to present another expert, as long as that was done before the date of trial, scheduled on July 7, 1998.

¶25. In denying the motion for a continuance, the judge went on to point out that defense counsel had been involved in the case for over a year and had known for some time prior to the late motion for a continuance

that Montgomery would testify concerning the population statistics.[1] Most importantly, the venue had been changed and the trial arranged to begin in Harrison County on July 7, 1998, a mere eight days after Baldwin's motion for a continuance. Baldwin's counsel suggested during the hearing that it would take them three to six months to obtain expert testimony to challenge the population statistics. Given the change of venue and the considerable arrangements that must have attended the setting of a trial date, as well as the fact that the motion for a continuance was made so close to the date of trial, it does not appear that the judge abused his discretion in denying the motion. In light of the fact that the trial judge allowed for an additional expert for Baldwin if he had procured such in a timely fashion, no manifest injustice resulted.

¶26. By extension, there is no indication that the Baldwin's proposed experts on population genetics could have refuted or successfully challenged Montgomery's testimony in this case. Baldwin's attempts to discredit Montgomery's testimony by challenging the population data forming the basis of her expert opinion amounts to no more than the "battle of the experts," which has become increasingly common in both criminal and civil litigation. Given unlimited time and money, there is no end to the amount of expert testimony that a criminal defendant could obtain. By contrast, the State would have the same opportunity. Even if Baldwin had secured another expert on population statistics, the State could then have secured its own expert. In light of the excess of time and money attendant to the battle of the experts, it is even more apparent that no manifest injustice resulted from the denial of a continuance, particularly since there is no showing that such an expert could have assisted the trier of fact.

### III. Whether the trial court erred when it admitted into evidence the oral statement of the defendant made to Lieutenant Eddie Coleman on April 12, 1996.

¶27. Baldwin challenges the trial judge's admission of the statements concerning the whereabouts of his car that he made to the Sheriff's Department several hours after his arrest and while he was in the patrol car. The statements that Baldwin made to the officers were obviously untruthful, and they were introduced at trial in an effort to show that Baldwin had concealed his crime by hiding and later destroying his car.

¶28. "A criminal defendant assailing the voluntariness of his statement has a due process right to a reliable determination that the statement was in fact voluntarily given." *Gavin v. State*, 473 So. 2d 952, 954 (Miss.1985); *Smith v. State*, 737 So. 2d 377, 382 (Miss. Ct. App. 1999). The trial judge sits as the trier of fact and must determine whether the incriminating statement was freely and voluntarily given. The judge should determine whether the criminal defendant was advised of his rights, including the right against self-incrimination as set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Then the judge should ascertain, under a totality of the circumstances and beyond a reasonable doubt, that the defendant's statement was freely and voluntarily given, and was not the result of force, threat, or intimidation. *See Smith v. State* at 382.

¶29. In the present case, the trial judge conducted a suppression hearing outside the presence of the jury, as required by law. *See Frost v. State*, 483 So. 2d 1345, 1350 (Miss. 1986). During the hearing, Greg Wright and Frank Baker of the Lowndes County Sheriff's Office testified that they had advised Baldwin of his *Miranda* rights, and that he freely and voluntarily waived his rights and chose to speak with the officers concerning the whereabouts of his car. Since Baldwin did not testify to refute those statement,[2] the trial judge's ruling to admit into evidence the statements made by Baldwin is not manifestly erroneous or reversible error.

¶30. Baldwin's argument on appeal is that neither officer who actually heard and testified to the incriminating

statements was present when Baldwin was advised of his rights, and that, given the lapse in time and the fact that Baldwin's custody was given over to different officers than the ones who originally arrested him, Baldwin should have been advised of his rights a second time. Baldwin relies on *Underwood v. State*, 708 So. 2d 18, 29-30 (Miss. 1998). In that case, Underwood was questioned by two officers for 30-45 minutes. The officers left the room when Underwood did not reveal anything about the burglary at issue. Then, an officer that Underwood knew went into the room and convinced Underwood to confess to his involvement in the burglary. The Court ruled that Underwood had knowingly and voluntarily incriminated himself. In that case, the third officer had asked Underwood if he had been advised of his rights and understood them. Underwood never indicated a desire to cease the questioning or have an attorney present, and Underwood was re-Mirandized on each subsequent day of questioning.

¶31. Nevertheless, neither *Underwood* nor *Miranda* requires that a criminal defendant be advised of his rights every time there is a brief pause in questioning. *Miranda* simply requires that "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." 384 U.S. at 473-74, 86 S. Ct. at 1627-28. In the present case, Baldwin was in continuous custody from the time of his arrest until the time that he was placed in the car with Officers Mulligan and Coleman. It is not clear how much or how frequently the officers of the Sheriff's Department questioned Baldwin during the hours when all were present at his house to execute the search warrant. It is clear, however, that Baldwin knew the officers wanted to find the 1975 Monte Carlo; the officers' questions were all related to that purpose, beginning immediately after Baldwin was read his rights. Baldwin never indicated at any time to the officers that he wished to invoke his rights or that he preferred not to answer their questions concerning the whereabouts of his car. Because Baldwin was advised of his rights, but never invoked those rights, the trial judge was not manifestly erroneous in ruling that Baldwin had freely and voluntarily made the statements to Coleman, and that Coleman could testify to the same.

## CONCLUSION

¶32. The trial judge did not abuse his discretion in allowing Anne Montgomery to testify concerning the DNA frequency profile, nor in denying Baldwin's motion for a continuance. Neither did the judge err in refusing to suppress the statements that Baldwin made to the police about the location of his car. Therefore, Baldwin's conviction and sentence and the judgment of the Lowndes County Circuit Court are affirmed.

¶33. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT POSSIBILITY OF PAROLE AFFIRMED.**

> **PRATHER, C.J., PITTMAN AND BANKS, P.JJ., SMITH, MILLS AND COBB, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY. DIAZ, J., NOT PARTICIPATING.**

1. Defense counsel alleged that he was making the last minute motion in light of his having learned that Montgomery was changing her statistical conclusions during a visit to Reliagene on June 22, 1998. It should be noted, however, that Montgomery changed her original opinion of one in 712 million to one in 19 million, a more conservative number which reflected the consideration of another unknown donor or variable, and actually benefitted Baldwin, as it made him less likely the donor of the sperm.

2. In an effort to protect Baldwin's Fifth Amendment rights, the trial judge ruled that Baldwin could testify at the suppression hearing for the limited purpose of establishing deficiencies in the *Miranda* warning without subjecting himself to cross-examination at the trial.