## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-KA-01655-SCT

*LATASHIA MICHELLE TAYLOR*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/04/1999 |
| TRIAL JUDGE: | HON. KATHY KING JACKSON |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROSS PARKER SIMONS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | KEITH MILLER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/19/2001 |
| MOTION FOR REHEARING FILED: | 5/17/2001; denied 7/19/2001 |
| MANDATE ISSUED: | 7/26/2001 |

**BEFORE PITTMAN, C.J., SMITH AND EASLEY, JJ.**

**PITTMAN, CHIEF JUSTICE, FOR THE COURT:**

¶1. Latashia Michelle Taylor was indicted for the capital murder of Brandee Whitehead, which occurred while Taylor was in the process of kidnaping A'Branee Whitehead, Brandee Whitehead's infant child. The trial court denied two separate pretrial motions to suppress statements made by Taylor to the police. Taylor was convicted in the Circuit Court of Jackson County on the charge of capital murder and was sentenced to life imprisonment without the possibility of parole. After the trial and sentencing, Taylor moved for a new trial, or, in the alternative, a JNOV, asserting various trial errors. This motion was denied. Aggrieved by the judgment rendered, Taylor perfected her appeal to this Court.

### FACTS AND PROCEEDINGS BELOW

¶2. Before trial, the defense filed a Motion to Suppress Taylor's statement from January 15, 1998, on the basis that the statement was made prior to Taylor being advised of her ***Miranda*** warnings and that the statement was the result of "threats, promises, coercion, and mistreatment on the part of law enforcement personnel...."

¶3. At the motion hearing, Detective Kathilee Bosarge testified that she had investigated the death of Brandee Whitehead and first spoke to Taylor on January 14, 1998, at the police department. Bosarge stated that she "Mirandized" Taylor by reading "her her rights from a rights form," that Taylor signed a waiver of those rights, and that this was also witnessed and signed by FBI Agent Jerome Lorraine. Bosarge spoke with Taylor for about three to four hours, during which Taylor gave Bosarge information regarding a person who had supposedly given her the baby and committed the crime. Another conversation occurred the following day which was preceded by Bosarge orally advising Taylor of her ***Miranda*** rights.

¶4. When Bosarge returned from lunch later that day, she had a message that Taylor wanted to speak with her. Bosarge again orally "Mirandized" Taylor. The conversation revolved around some questions Taylor had regarding visiting hours. Bosarge asked Taylor if there was anything else she wanted to discuss. When Taylor indicated that she had nothing else to discuss, Bosarge discontinued the conversation and left the room. Bosarge then advised Captain Mike Ezell that she "was through." Chief Whitmore then told Bosarge that Detective Sheila Jenkins was going to question Taylor next.

¶5. When Bosarge later returned to the department she was told that Jenkins had "gotten a confession from Ms. Taylor" and that Taylor wanted to see her. Bosarge "just walked in there where she was sitting in the same interrogation room and..." Taylor told her "that she had, you know, told the truth." When Bosarge asked Taylor why she had not revealed this information to her Taylor responded that she "was scared."

¶6. Detective Jenkins testified that she passed Bosarge in the hall prior to interviewing Taylor and that Bosarge informed her that Taylor had been read her *Miranda* rights. Jenkins testified that Taylor appeared to be mentally competent at the time of the interview and was able to read and write. Jenkins also stated that her conversation with Taylor was "lengthy"and that it lasted "hours." Jenkins testified that Taylor never asked for the questioning to cease or for her lawyer. Jenkins stated that she never threatened or made any promises of help or leniency to Taylor to get her statement. Instead, Jenkins told Taylor "repeatedly" that she was going to jail and that she could not help her avoid incarceration. When asked if Taylor began the conversation by telling the truth, Jenkins testified that at first she continued to lie, but ultimately confessed to the crime. When asked if there was any coercion, Jenkins replied, "no, sir."

¶7. Most of the interview consisted of only Taylor and Jenkins being in the room with Captain Ezell and Chief Whitmore viewing the process through a one-way mirror in an observation room. At some undetermined time someone in the observation room began videotaping the interview, a process in which Jenkins was not involved.

¶8. At one point, Ezell entered the room, and said, "Sheila...I'm going to explain some things here." The videotape in the observation room stopped recording and was restarted moments later capturing Jenkins continuing her interview of Taylor. It was Jenkins impression that the interview was being stopped and that Taylor would be returned to her cell. The length of time in which the tape did not record was approximately "a minute" or "a minute and a half." The content of Ezell's conversation was not recorded by any electronic means, although Jenkins did provide a supplement report some seven months after the interview took place. According to Jenkins, Ezell told Taylor, "You've lied and there is no guy...We're just wasting our time. Stop wasting this detective's time." According to Jenkins, Ezell made no promises or threats to Taylor. Jenkins then realized that the interview was not being stopped and "kept on with the interview." Jenkins stated that Ezell's interruption did not have any immediate impact as she found it necessary to talk with Taylor for "a long time" before she began to change her story and began confessing to the crime.

¶9. During the interview, Ezell summoned Sergeant Ronnie Castille to the observation room, where he found that the video camera was "not in record mode." Castille performed two functions, and "the camera went into the record mode." He then "exited from the room."

¶10. Ezell testified that "Ms. Taylor called . . . to come up. She wanted to talk to Kathilee [Bosarge]." Prior to speaking with Taylor, Bosarge "verbally gave her her *Miranda* warning ...." While Ezell and Chief Whitmore "were in the observation room watching," they decided that Jenkins might "be able to get some

more information from Ms. Taylor." Ezell and Whitmore went to Jenkins's office, where they asked her to interview Taylor and gave "gave her a brief, short briefing there." According to Ezell, "[l]ess than ten minutes" elapsed between the time Bosarge left the interview room and when Jenkins entered it.

¶11. At one point during Jenkins's interview with Taylor, Whitmore told Ezell to "[g]o in there and tell her [Taylor] to quit lying." Ezell then "went in there and told her, you know, quit lying. We didn't believe her. Something to that effect." When he went into the interrogation room, Ezell "assumed" that the video camera was still running. Ezell did not know what had caused the camera to turn off. Ezell testified that he was never alone with Taylor, and he denied coercing or making any promises to induce the statement.

¶12. Chief Whitmore testified that he had instructed Ezell to go into the interrogation room and terminate the session. While he was unable to hear what Ezell actually said, he "saw no reason to believe" that Taylor "had been threatened, was threatened or intimidated by any officer of the Pascagoula Police Department." Whitmore testified that he attempted to adjust the focus of the camera because the picture on the monitor had become unfocused. Once Ezell returned from the interrogation room, Whitmore, Castille, and he "had a short discussion. Ezell pointed out that "he didn't think the camera was running." Castille was called into the room and successfully restarted the camera. Whitmore stated that he did not intentionally turn the camera off, and he had "no idea" how it had been turned off, or if he even turned it off when he attempted to adjust the camera's focus.

¶13. Taylor provided conflicting testimony during the hearing, stating at first that she had not been given *Miranda* warnings, then later confirming that warnings had been administered. According to Taylor, Ezell pointed his finger at her, yelled that the officers were tired of her wasting their time with her lies, and told her that if she did not tell the truth, she and her boyfriend were "going down." Taylor also testified that Ezell "cursed twice." When asked whether Jenkins had offered her any assistance, Taylor testified, "She said that if I would tell her the truth, or tell her what happened, that she would help me the best she could." Taylor testified that because she thought Jenkins "was going to help" her, she gave a confession. On redirect examination, she testified that she thought she was "going home" if she made a statement.

¶14. During cross-examination, Taylor acknowledged that Bosarge had advised her of her rights on at least three occasions and that she understood those rights and realized that she could stop answering questions at any time. Taylor testified that she had graduated from high school, was able to read and write, and that she had signed the waiver-of-rights form. Taylor testified that although Jenkins did not read Taylor her rights, she was still aware of them at the time Jenkins was questioning her.

¶15. Taylor did not give her confession immediately after Ezell left the room, but that "it wasn't long" after Ezell had left. Taylor stated that Ezell did not threaten her physically, but that she "felt threatened by the tone of his voice." Taylor testified that she became scared and ultimately confessed out of concern for her boyfriend, who was also being investigated. In Taylor's words, "She [Jenkins] told me that she would be able to help him if I told her what happened." She acknowledged, however, that Jenkins had said, "And if we can prove that he's not involved, that he had no knowledge . . . " and that Taylor had interrupted, "That can be proved." Soon thereafter, she admitted that Jenkins never threatened her. When asked whether Jenkins had promised her anything, Taylor responded that "She ... made the promise that she would help my boyfriend." Taylor quoted Jenkins as having said, "The truth will help your boyfriend."

¶16. In rebuttal, Jenkins testified that Taylor "didn't appear to be scared" when Ezell left the interrogation room, but that Taylor exhibited the "[s]ame demeanor" of calm and that Taylor stuck "to her story . . . for

quite sometime." Jenkins denied having given Taylor any reason to believe that she would go free, or that her boyfriend would be "cut loose," if she told the truth. The defense recalled Taylor, who testified that after she confessed, Jenkins came to her cell block twice to advise her that Jenkins "was doing what she could" to see that Taylor's boyfriend was released.

¶17. With detailed findings of fact and conclusions of law, the court denied the motion to suppress. Three months later the defense filed a second motion to suppress the statement, focusing on the allegedly coercive effect of Bosarge's interrogation of Taylor. The trial court denied the second motion to suppress finding that neither Bosarge or Lorraine had made any statements or threats that caused Taylor to confess.

## DISCUSSION

¶18. Taylor's appeal focuses primarily on the trial court's denial of the motion to suppress the statement given by Taylor to Detective Jenkins regarding whether proper *Miranda* warnings were given and whether Taylor's confession was the result of threats or promises by police. Also at issue is if the credibility of the confession was tainted by the fact that a few minutes of the interview were not recorded and that some editing to the transcript occurred months after the statement was given. Finally, Taylor claims that the trial judge should have recused herself because one of the primary witnesses for the State, Bosarge, was at the time of these proceedings an employee of the court where the trial judge presides.

¶19. The first motion to suppress the statement concentrated on Taylor's contentions that she was not advised of her *Miranda* warnings and that she was induced to make the confession by police personnel. The allegations regarding the motion to suppress were later expanded to cover problems that occurred in taping of the statements. The trial court denied the motion in a lengthy nine-page ruling.

¶20. Taylor's second motion to suppress the statement centered on the interview conducted by Bosarge and FBI Agent Jerome Lorraine, contending that Taylor was induced into making her confession due to threats, inducements and promises made by the officers. The trial court denied the second motion, ruling that nothing said by either officer induced Taylor's confession to Jenkins the following day.

¶21. This Court in *Baldwin v. State*, 757 So.2d 227 (Miss. 2000), discussed the heavy burden that must be met for a trial court's decision regarding a motion to suppress to be overturned. This Court stated:

> A trial court is also given deference in the admissibility of an incriminating statement by a criminal defendant. In *Hunt v. State*, 687 So.2d 1154, 1160 (Miss.1996), this Court held that the defendant seeking to reverse an unfavorable ruling on a motion to suppress bears a heavy burden. The determination of whether a statement should be suppressed is made by the trial judge as the finder of fact. *Id*. "Determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence." *Balfour v. State*, 598 So.2d 731, 742 (Miss.1992); *Alexander v. State*, 736 So.2d 1058, 1062 (Miss.Ct.App.1999).

*Baldwin v. State*, 757 So.2d at 231. "Where, on conflicting evidence, the lower court admits a statement into evidence this Court generally must affirm." *Dancer v. State*, 721 So.2d 583, 587 (Miss.1998) (citing *Morgan v. State*, 681 So.2d 82, 87 (Miss.1996)).

¶22. In its conclusions of law in the order denying the motion to suppress, the trial court stated the following:

The defendant has alleged that her video confession was involuntary because it was obtained as a result of promises or statements made by a police officer to help her and her boyfriend. Once such issues are raised by the defendant, the State [o]f Mississippi is required to bring forth evidence which proves beyond a reasonable doubt that the confessions was voluntarily given. The burden is met and a prima facie case is made when persons having knowledge of the facts testify that the confession was voluntarily given without threats. ***Chase v. State****,* 645 So.2d 829, 838 (Miss.1994). When such testimony is then rebutted by the defendant, the State is required to offer all witnesses to the confession. ***Agee v. State***, 185 So.2d 671 (Miss.1966).

¶23. The trial court used the correct standard in denying the motion to suppress the statement. The trial court also correctly provided detailed and specific findings of fact which this Court gives great deference to on appeal. ***Gavin v. State***, 473 So.2d 952, 955 (Miss. 1985).

### A) WAS THE STATEMENT PRECEDED BY A *MIRANDA* WARNING?

¶24. Taylor contends that she was not properly Mirandized prior to making her confession to Jenkins and that the only time she was given sufficient *Miranda* warnings was when Bosarge administered them the day before the confession was given.

¶25. The record shows that Bosarge read the *Miranda* warnings to Taylor and secured waiver of those rights on the first day of questioning. The following day Bosarge questioned Taylor again after orally advising her of her *Miranda* rights. Later that same day, Bosarge was informed that Taylor wanted to speak with her. Bosarge again presented Taylor the *Miranda* warnings orally. When that conversation ended, Detective Jenkins was instructed to question Taylor. Jenkins testified that she passed Bosarge in the hall prior to interviewing Taylor and that Bosarge informed her that Taylor had been read her *Miranda* rights. Jenkins testified that Taylor appeared to be mentally competent at the time of the interview and was able to read and write.

¶26. Taylor's contention that she was not properly informed of her *Miranda* rights is unfounded. In regard to the sufficiency of giving *Miranda* warnings orally and whether there is a requirement that they be in written form, this Court has stated:

> nor are we aware of any which requires that a waiver of an accused's constitutional privileges against self- incrimination, right to counsel, etc. must be in writing and signed by the accused before inculpatory statements made by him and otherwise freely and voluntarily given are admissible in evidence. Such a statement is admissible provided the accused has been afforded the protection of the Miranda warning and he thereafter knowingly and intelligently waives his rights and freely and voluntarily makes the statement.

***Davis v. State***, 320 So.2d 789, 790 (Miss. 1975). The Mississippi Court of Appeals recently reiterated the adequacy of orally administering *Miranda* warnings in stating "oral *Miranda* warnings and waivers are effective if proven to the satisfaction of the trier of fact," *Dees v. State*, 758 So.2d 492, 495 (Miss. Ct. App. 2000). The detailed findings of fact and conclusions of law provided by the trial court show that the trier of fact in this case was satisfied with the effectiveness of the oral *Miranda* warnings.

¶27. Taylor asserts that the gap in time between Bosarge leaving the interview and Jenkins beginning her questioning warranted Jenkins providing Taylor with new *Miranda* warnings because it constituted "a new

questioning session." Testimony at the suppression hearing shows that this period of time was "less than ten minutes" in duration. Taylor points to *Underwood v. State*, 708 So.2d 18 (Miss. 1998), in the hope of showing that Jenkins should have given new *Miranda* warnings to Taylor prior to her portion of the interview. *Underwood* dealt with interviews where renewal of the *Miranda* rights occurred on a daily basis. This Court has recently stated:

> neither *Underwood* nor *Miranda* requires that a criminal defendant be advised of his rights every time there is a brief pause in questioning. *Miranda* simply requires that "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (citing *Miranda v. Arizona*, 384 U.S. at 473-74, 86 S.Ct. at 1627-28).

*Baldwin v. State*, 757 So.2d at 235.

¶28. In the present case, the five to ten minutes that elapsed between Bosarge's interview and Jenkins's interview constituted a "brief pause in questioning," which did not require a renewal of *Miranda* warnings. Additionally, Taylor had been advised of her *Miranda* rights three times in a period of less than twenty-four hours. Taylor was properly advised of her rights prior to making her confession. It cannot be said that the trial court's determination regarding this issue was the result of an erroneous legal standard, manifestly wrong or against the overwhelming weight of the evidence. This issue is without merit.

### B) WAS THE STATEMENT GIVEN INDUCED BY THREATS OR PROMISES?

¶29. Taylor contends that her confession should have been suppressed because it was the product of threats and promises made by police personnel Jenkins and Ezell, as well as FBI Agent Lorraine. Taylor cites *Abram v. State*, 606 So.2d 1015 (Miss. 1992), where this Court commented on coerced or improperly induced statements. This Court held, "[w]e have repeatedly condemned the practice whereby law enforcement interrogators, or related third parties, convey to suspects the impression, however slight, that co-operation by the suspect might be of some benefit." *Id.* at 1031.

¶30. Regarding statements made by Detective Jenkins prior to Taylor's confession, the record shows that Jenkins's statements served to urge Taylor to tell the truth so she would feel better about herself. Jenkins clearly stated during the interview that she did not have the authority to get any charges dropped or reduced for Taylor or her boyfriend.

¶31. Captain Ezell's statements were not captured on the videotape of Taylor's interrogation but testimony at the hearing provided insight as to what was said by Ezell when he entered the room. It is apparent that Ezell used a tougher tone and may have even cursed when talking with Taylor. Taylor asserts that Ezell yelled at her and said that if she did not tell the truth that she and her boyfriend were "going down." According to Jenkins, Ezell told Taylor, "You've lied and there is no guy...We're just wasting our time. Stop wasting this detective's time." Jenkins also testified that Ezell made no promises or threats to Taylor. Watching from the observation room and unable to hear the dialogue between the participants in the interview, Chief Whitmore stated that he did not see anything to cause him to believe that Taylor was threatened or intimidated while Ezell was in the room.

¶32. Taylor also contends that the groundwork for an induced confession was laid at Taylor's first interview with Officer Bosarge and FBI Agent Lorraine. Taylor points to statements Lorraine admitted making during his interview with Taylor. These statements consist of Lorraine explaining to Taylor that she will be better

off if she tells the truth and asking her to explain what occurred so she can have peace of mind. Taylor contends that the combined words and actions of Jenkins, Ezell and Lorraine remove the voluntariness from Taylor's confession.

¶33. The Mississippi Court of Appeals recently addressed the issue of overruling a motion to suppress in *Mullins v. State*, 757 So.2d 1027 (Miss. Ct. App. 2000). The Court of Appeals stated:

> Regarding the overruling of a motion to suppress by the circuit court, our scope of review is limited. "Once the trial judge has determined at a preliminary hearing, that a confession is admissible, the defendant/appellant has a heavy burden in attempting to reverse that decision on appeal." *Sills v. State*, 634 So.2d 124, 126 (Miss.1994) (quoting *Frost v. State*, 483 So.2d 1345, 1350 (Miss.1986)). "Such findings are treated as findings of fact made by a trial judge sitting without a jury as in any other context. As long as the trial judge applied the correct legal standards, his decision will not be reversed on appeal unless it is manifestly in error, or is contrary to the overwhelming weight of the evidence." *Foster v. State*, 639 So.2d 1263, 1281 (Miss.1994) (citations omitted). "Where, on conflicting evidence, the court makes such findings, this Court generally must affirm." *Lesley v. State*, 606 So.2d 1084, 1091 (Miss.1992) (citations omitted).

*Mullins*, 757 So2d. at 1030.

¶34. The question before this Court is whether there were promises or inducements offered by the officers to Taylor if she confessed. The trial court used the correct legal standard enunciated by this Court. "The test in such cases is whether the inducement is of a nature calculated under the circumstances to induce a confession irrespective of its truth or falsity." *Robinson v. State*, 247 Miss. 609, 612-13, 157 So.2d 49, 51 (1963). The trial court also properly considered *Layne v. State*, 542 So.2d 237, 240 (Miss. 1989), where this Court found that a defendant, who claimed that he had confessed as a result of promises made by the officers that he would receive leniency, had freely and voluntarily given his statement "after he had been appropriately advised of his rights, and done without any force, threats or promises having been made."

¶35. In the first motion to suppress, the trial court carefully reviewed the evidence and law and determined that the actions of Jenkins and Ezell did not constitute promises, inducements or threats and that Taylor confessed "because she knew that the truth would clear her boyfriend." Although the trial court did not provide a memorandum order for the second motion for suppression, it can be safely assumed that the trial court used the same standards in reviewing Lorraine's statements. Lorraine's comments during Taylor's initial interview did not rise to the level of promises, inducements or threats that would render Taylor's confession that occurred on the following day involuntary.

¶36. The trial court applied the correct legal standard and did not make a decision that was manifestly in error or contrary to the overwhelming weight of the evidence. This assignment of error is denied.

### C) SHOULD THE FACT THAT THERE WAS INTERFERENCE WITH THE TAPING MECHANISM USED TO RECORD THE CONFESSION RENDER THE CONFESSION UNRELIABLE AND DOES THE FACT THAT THERE WAS EDITING OF THE TRANSCRIPT MONTHS AFTER THE STATEMENT WAS GIVEN CALL THE TRANSCRIPTS CREDIBILITY INTO QUESTION?

¶37. Taylor contends that the videotaped confession is unreliable due to the gap in the recording that coincided with Ezell entering the room. Taylor claims that the unrecorded portion of the tape would have captured Ezell making threatening statements that eventually led to Taylor making her confession.

¶38. The fact that a portion of the interview was not recorded does not render the tape unreliable or Taylor's confession involuntary. Assuming Ezell's conduct during the unrecorded period was as Taylor described, which is substantially similar to the testimony of the officers present during the interview, its effect on Taylor's ability to make a voluntary confession was negligible. We agree with the trial court's finding that testimony at the hearing adequately supplemented the missing portion of the tape and that Taylor's propensity to make a confession was not affected by Ezell's raising of his voice or the use of profanity.

¶39. Taylor also asserts that the transcript of Detective Jenkins interview is unreliable because Jenkins edited many of the unintelligible parts months after the interview occurred. Taylor claims that she was not provided with the amended transcript in the discovery process, but only the original, and that her counsel was not afforded the opportunity to prepare properly for the suppression hearing with the corrected transcript. Both the original transcript and the amended transcript were admitted into evidence.

¶40. The record indicates that the trial court recognized that counsel for Taylor might need time to review the amended transcript. Fifteen minutes were allotted for defense counsel to conduct such a review. While it may have been reasonable for Taylor to get even more time to peruse the amended transcript, at the moment the amended transcript was admitted, counsel for Taylor did not request a continuance. This Court has stated that a trial court will not be put in error for failing to grant a continuance when one was not requested. *Carney v. State*, 525 So.2d 776, 779 (Miss. 1988).

¶41. The fact that there was editing of the transcript does not adversely affect the transcript's reliability. In the present case the trial court judge also had the original transcript and witness testimony to consider when making her decision regarding the admissibility of the confession. As correctly presented by the State, "[w]hether the confession as introduced was accurate went to the weight and credibility of the testimony and was a jury issue." *Jordan v. State*, 320 So.2d 376, 377 (Miss.1975). *Accord*, *Underwood*, 708 So.2d at 31 (trial court was not required to suppress statements on which officer had corrected the dates of signing; question of the reliability of the statements was for the jury); *Cole v. State*, 525 So.2d 365, 368 (Miss.1987); *Weathers v. State*, 237 So.2d 441 (Miss.1970).

¶42. The trial court's decision that the tape missing a portion of the interview and the amended transcript were admissible was not manifestly in error or contrary to the overwhelming weight of the evidence. This assignment of error is denied.

### D) DID THE TRIAL JUDGE ERR IN NOT RECUSING HERSELF WHEN FACED WITH HAVING TO RULE ON TESTIMONY GIVEN BY ONE OF HER OWN PRESENT EMPLOYEES?

¶43. Taylor asserts that the Code of Judicial Conduct required the trial judge to recuse herself sua sponte from the suppression hearings. Taylor argues that Kathilee Bosarge's position as an employee of the Circuit Court Judges of the Nineteenth Circuit Court District created an appearance of impropriety and therefore required the trial judge to recuse herself. The relevant section is Canon 3C(1), which reads as follows:

C. Disqualification.

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

For Taylor to successfully show that recusal should have taken place she must show the following:

The law surrounding the recusal of a judge in Mississippi is well settled. Under Canon 3 of the Code of Judicial Conduct, an appellate court, in deciding whether a judge should have disqualified himself from hearing a case uses an objective standard. "A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality." *Jenkins v. Forrest County Gen. Hosp.*, 542 So.2d 1180, 1181 (Miss.1988). "The decision to recuse or not to recuse is one left to the sound discretion of the trial judge, so long as he applies the correct legal standards and is consistent in the application." *Collins v. Joshi*, 611 So.2d 898, 902 (Miss.1992). This Court presumes that a trial judge is qualified and unbiased, and this presumption may only be overcome by evidence which produces a reasonable doubt about the validity of the presumption. *Bredemeier v. Jackson*, 689 So.2d 770, 774 (Miss.1997). When a judge is not disqualified under the constitutional or statutory provisions the decision is left up to each individual judge and is subject to review only in a case of manifest abuse of discretion. *Buchanan v. Buchanan*, 587 So.2d 892, 895 (Miss.1991).

*Tubwell v. Grant*, 760 So.2d 687, 689 (Miss. 2000).

¶44. A careful review of the record yields scant information regarding Bosarge and her employment status at the time of the suppression hearing and trial. During the first suppression hearing, when asked where she was employed, Bosarge stated that she was "currently with the city" (of Pascagoula) and that she was "on leave, waiting to go to another job." The record does not indicate if she already had a job waiting with the trial court at this time or if she was on leave from her position with the City of Pascagoula and was searching for a job. There are not enough facts in the record to determine whether the trial judge should have recused herself during the motion to suppress hearing. Taylor fails to overcome the presumption that the court was unbiased and qualified to conduct the suppression hearings.

¶45. The only indication of Bosarge's employment with the trial court appeared in the record during the trial phase in the following exchange:

BY THE COURT: I wanted to tell y'all that I told Kathilee not to mention the fact that she now works for the Court. If y'all ask, she's not to answer. She works for the county.

BY MR. CONANT: You're not directing me not to ask her that, are you?

BY THE COURT: No. I'm just telling you I don't want any connection between her and the Court before the jury, unless you want to.

¶46. The prospect of Bosarge testifying at trial before her superior, combined with the trial judge's statements, are somewhat troubling. These facts, however, do not overcome the presumption that the court was unbiased. The trial judge's comments appear to have been made in the hope of preventing the appearance of impropriety, but instead served to create such a concern.

¶47. Even interpreted in the harshest manner, the trial judge's comments are still insufficient to show that the court was biased. This Court has stated that it will not reverse cases on the basis of speculation and conjecture. *Hester v. State*, 741 So.2d 229, 232 (Miss.1999). Taylor failed to show a "manifest abuse of discretion" in the judge's failure to recuse herself sua sponte. This issue is without merit.

## CONCLUSION

¶48. For these reasons, the judgment of the Jackson County Circuit Court is affirmed.

¶49. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT PAROLE AFFIRMED.**

**BANKS AND McRAE, P.JJ., SMITH, MILLS, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR.**