947 So.2d 341 (2006)
John Thomas SCOTT, Appellant
v.
STATE of Mississippi, Appellee.
No. 2005-KA-00745-COA.
Court of Appeals of Mississippi.
September 5, 2006.
Rehearing Denied January 16, 2007.
*342 James P. Johnstone, attorney for appellant.
Office of the Attorney General by W. Glenn Watts, attorney for appellee.
Before LEE, P.J., SOUTHWICK and ISHEE, JJ.
SOUTHWICK, J., for the Court.
¶ 1. A Pontotoc County Circuit Court jury found John Thomas Scott guilty of two murders and of possession of a firearm by a felon. A judgment of conviction was entered. On appeal, he argues various defects regarding his confession, and also that the admission of the murder weapon into evidence violated his constitutional rights. We find no error and affirm.

FACTS
¶ 2. Dudley Coleman and Jennifer Lenard were shot and killed in a wooded area along Highway 9 in Pontotoc County on September 27, 2003. Testimony at trial revealed that the decedent Coleman and defendant John Thomas Scott were involved in the sale of methamphetamine. Scott owed Coleman about $4,500 as a result of these dealings. The night before the murders, Scott believed Coleman attempted to burglarize his home in order to collect the debt.
¶ 3. On the day of the murders, Coleman and Scott agreed to meet and discuss the debt. They met along Highway 9 between Pontotoc and Bruce. Scott parked his vehicle and got into Coleman's vehicle. Jennifer Lenard was Coleman's passenger. After a short drive, Coleman's vehicle came to a stop on a county road. An argument ensued, and Scott shot Coleman from the back seat of the vehicle. Scott shot Lenard when she began to exit the car, though the shot was not fatal. Before fleeing on foot, Scott delivered a second and fatal shot to the back of Lenard's head. Scott then ran into the nearby woods, threw the murder weapon into a pond, and was arrested a few hours later by the Pontotoc County Sheriff's Office. Almost from the moment of his capture, Scott admitted these events to the sheriff and to others and attempted to justify the shootings.
¶ 4. In November 2003, Scott was indicted on two counts of murder and one count of possession of a firearm by a convicted felon. In July 2004, a Pontotoc County Circuit Court jury found him guilty on all counts and the court sentenced Scott to two life sentences and three years as an habitual offender. Scott had previously served time in prison for burglary and larceny. Scott had served some of this earlier prison time with his victim Coleman.
¶ 5. At trial, Scott's testimony was that he shot Coleman in self-defense. Coleman allegedly was reaching for a gun in the vehicle's console. Scott said that he shot Lenard as a reaction to the melee when she attempted to exit the vehicle. He shot her again as he was running into the woods, but he alleged that he had simply *343 shot in her direction but not at her. Scott's explanation of the two shootings was refuted by Dr. Steven Hayne, the forensic pathologist who performed the autopsies. He determined that the path of Coleman's bullet wound was not consistent with his turning to grab a gun. Dr. Hayne also believed that the fatal shot to Lenard was to the back of her head and at close range, not from a distance as Scott was running away.
Issue 1: Scott's request for counsel at time of arrest
¶ 6. Scott argues that he requested counsel prior to being questioned and the request was ignored. Though the versions of the circumstances surrounding the request differ, there is general agreement that at least a mention of counsel occurred either immediately before Scott was placed into custody or while he was being handcuffed. There are three basic versions of Scott's mention of counsel. Each shows that the request was made on the day of the murders, in the immediate hours following the shooting, and at the time that Scott was being taken into custody.
¶ 7. Pontotoc County Sheriff Leo Mask went to investigate the shooting. He received a call that Scott was hiding in the woods nearby. The sheriff said that after looking in the woods he came across a person. He shone a flashlight, saw Scott, and told him to "get down on the ground." Scott complied, then Sheriff Mask asked him "what he was doing" and to identify himself. Scott gave his name and responded: "you know what I'm doing." Sheriff Mask testified that before he read Scott a description of his rights, Scott remarked: "I probably need to talk to a lawyer."
¶ 8. Deputy Mike McGowan was also present in the woods. McGowan said he was patting down Scott to check for weapons when Scott said, "I probably need to talk to a lawyer."
¶ 9. Scott testified that "Sheriff Mask asked me why I did it. I told him. It ain't what you think. And then he asked me where the gun was, and I told him I wanted a lawyer, and then he asked me why I did it."
¶ 10. After his arrest, Scott was taken to jail where he was booked by Deputy William VanGorder. Deputy VanGorder asked questions relating to the booking process such as Scott's name and address, but he did not interrogate Scott about the crime. At that time, Scott volunteered information about the crime. Scott did not, during the interaction with Deputy VanGorder, request an attorney.
¶ 11. After being booked, Scott was again advised of his rights by Deputy Junior Rossell. Afterward, Scott signed a waiver of his rights and began to volunteer the details of the crime which included Scott's admission that he had shot both victims. At no time during Deputy Rossell's involvement did Scott request an attorney.
¶ 12. After the hearing on Scott's motion to suppress, the trial court ruled that Scott never "specifically invoke[d] his right to have an attorney present during questioning."
¶ 13. All of the versions of the request are clear that the request was made during the time of or immediately before arrest. There is nothing in the record to indicate that Scott made the request for counsel during an interrogation. A request for counsel is not "triggered" unless made during an "interrogation." CHARLES H. WHITEBREAD & CHRISTOPHER SLOBOGIN, CRIMINAL PROCEDURE § 16.03 (3d ed.1993). The authors rely for this conclusion on Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In *344 Edwards, the Supreme Court held that once an accused has requested counsel during the interrogation process, that the accused may not be questioned further until the attorney is present, unless the accused voluntarily begins to talk again. Id. at 484-85, 101 S.Ct. 1880.
¶ 14. The somewhat varied accounts in our case agree that the only reference to an attorney was the statement of "probable" need while the sheriff was engaged in his first encounter in the woods with Scott. The language is surprisingly like that used by a United States Navy sailor when he was being questioned about a murder. He said, "Maybe I should talk to a lawyer." Davis v. United States, 512 U.S. 452, 454, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). The agent questioning him then asked whether he wanted to stop and talk to a lawyer, and the answer was that he did not. Id. The Supreme Court declared that the Edwards rule requiring questioning to stop until a lawyer is located or the accused reinitiates the conversation, does not apply when the "suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel,. . . ." Id. at 459, 114 S.Ct. 2350. We find the circumstances here, with Scott in the woods just after being caught by the sheriff, to make the statement more of an indication that Scott understood that he was in considerable trouble but not to be an actual request for counsel. Scott's actions immediately thereafter in talking at considerable length to the sheriff indicated this was the proper interpretation of Scott's comment.
¶ 15. The Edwards "bright line rule" prevents overriding a suspect's unequivocal request for counsel by badgering or lesser forms of persistence whereby the police encourage waiver of a right already invoked. "To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry." Id. at 458-59, 114 S.Ct. 2350. Objectively viewed, Scott's statement that he would "probably need to talk to a lawyer" was ambiguous and easily seen as simply an admission that he was in substantial legal difficulty. The request did not occur during interrogation and therefore could not have crossed the Edwards bright line anyway.
Issue 2: Scott's confession
¶ 16. Scott makes two additional challenges to his statements to the sheriff. Both are the basic allegation that the confession was not made voluntarily and all evidence obtained by the confession should have been excluded. We discuss Scott's two other perspectives on the issue.
A. Scott's drug use rendered the confession involuntary
¶ 17. Scott argues that his confession was neither voluntary nor obtained with his "full knowledge" of the consequences of the confession. Scott testified that he had been abusing drugs and had not slept for a number of days prior to talking to officers. Scott informed the officers of this fact. The officers do not dispute that claim. Scott argues that his chemical dependency rendered him unable to make a free and voluntary confession.
¶ 18. Sheriff Mask and Deputy McGowan characterized Scott as being generally cooperative during the arrest. The sheriff said that Scott did not appear to be under the influence of alcohol, but that he could not really tell if he was under the influence of drugs. Scott told Sheriff Mask that he had been using methamphetamine. Deputy McGowan stated that he did not believe Scott to be under the influence of drugs or alcohol.
*345 ¶ 19. Deputy Rossell did not believe Scott to be under the influence of alcohol or drugs once Scott was brought to the sheriff's office. Deputy Rossell testified that he did not smell alcohol on Scott, and he did not appear to be under the influence of narcotics. Rossell said that Scott "seemed to know what he was telling me." Scott did not tell Rossell that he had been using methamphetamine or that he had not slept in many days.
¶ 20. When Deputy Van Gorder asked Scott during booking whether he had taken any drugs or had been drinking, Scott replied that he had used methamphetamine earlier that day. Van Gorder said that Scott did not appear to be nervous, but that he seemed to be trying to "explain himself out of the situation." Van Gorder stated than Scott was "just volunteering the information. The only questions I was asking him pertain[ed] to booking."
¶ 21. The sheriff's office did not test Scott for the presence of drugs. In one precedent, the defendant made an argument that his confession was involuntary due to the use of narcotics. Bryant v. State, 853 So.2d 814 (Miss.Ct.App.2003). The defendant's mother corroborated his drug addiction. Despite the testimony, we found that the confession was voluntary because the evidence showed it was the product of the defendant's "free and rational choice." There was also testimony from an officer in Bryant that the defendant did not appear to be intoxicated at the time of the confession. Id. at 820.
¶ 22. Where an accused impresses law enforcement officials as being unimpaired despite drug use, that opinion is admissible evidence. Were a drug-induced confession to be admitted at trial, a defendant's constitutional rights against self-incrimination would be violated. Jenkins v. State, 607 So.2d 1171, 1175 (Miss. 1992) (citing Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)). The trial court had admitted Jenkins's statement. The decision was affirmed because police officers testified that Jenkins appeared "straight" and "alert" at the time of the confession. Jenkins also testified that he was "competent" and "uncoerced" when he gave the confession. Id.
¶ 23. All law enforcement personnel who testified stated that Scott did not appear to be under the influence of drugs. There was no corroboration of Scott's assertions to the contrary.
¶ 24. In addition, Scott's actions on the day of the murders also indicated a mind capable of perceiving the world around him and taking control of his own actions. Scott testified that he had driven to meet Coleman. After Scott admitted that he shot the victims, he testified that he wiped his fingerprints off of the car door. He also wiped fingerprints from the murder weapon and tossed it in a nearby lake. He avoided returning to his vehicle, opting instead to flee in another direction. He went to an area near the lake to assist his fiancee, as he feared his fiancee was in some sort of danger. At that time, he recognized a resident of the area and identified himself. Scott also recognized the resident as the owner of a store. Scott also said he recognized Sheriff Mask once he had arrived. Scott then gave a vivid recounting of the very precise conversation he alleges to have had with Sheriff Mask from the woods. These behaviors support that Scott's confession was with "full knowledge" of the consequences of making it.
¶ 25. At the hearing on the motion to suppress, the trial court found that Scott was not "under the influence to any extent that he could not waive his constitutional rights." The evidence we have summarized supports that conclusion.
*346 B. Duress
¶ 26. The trial court found Scott's statements were "freely and voluntarily made, without any threats, coercion, promises, offer of reward or any other inducements." Scott argues otherwise.
¶ 27. The burden of proof is on the prosecution to show beyond a reasonable doubt that a confession is voluntary. Granger v. State, 853 So.2d 830 (Miss.Ct. App.2003). The prosecution may meet its burden to discredit the claim of coercion through police officers who testify that the confession was voluntarily made and was not obtained by "threats, coercion, or offer of reward." Id. at 834. The Mississippi Supreme Court has defined "inducements" to confessions as being "of a nature calculated under the circumstances to induce a confession irrespective of its truth or falsity." Taylor v. State, 789 So.2d 787, 795 (Miss.2001).
¶ 28. The only evidence that the confession was the result of any kind of duress was given by Scott himself. Scott testified that Sheriff Mask "cocked the gun and told me if I didn't tell him where I [threw] that pistol, that he was going to shoot me in the back of the head like I did them people." In his brief, Scott argued that he confessed to Sheriff Mask while he was "face down in mud with the Sheriff's rifle pointed at his head." He believed that scenario "would put fear and intimidation into the hearts of any person, as was the officer's intent." The only individuals present other than Scott when this alleged intimidation occurred testified and did not support the claim.
¶ 29. Based on the evidence presented, the trial court was justified in rejecting Scott's arguments that his admissions regarding the shootings were coerced.
Issue 3: The fruit of the poisonous tree
¶ 30. Scott believes the murder weapon should not have been admitted into evidence because his confession that revealed the location of the weapon was "illegally obtained." We have already rejected the assertions of involuntariness. Therefore, the tree from which this evidence was obtained was in no way poisoned.
¶ 31. THE JUDGMENT OF THE PONTOTOC COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I MURDER AND SENTENCE OF LIFE; COUNT II MURDER AND SENTENCE OF LIFE; COUNT III POSSESSION OF A FIREARM BY A CONVICTED FELON AND SENTENCE OF THREE YEARS ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AS A HABITUAL OFFENDER, WITH ALL SENTENCES TO RUN CONSECUTIVELY, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PONTOTOC COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.