KING, C.J.,
 

 for the Court.
 

 ¶ 1. On August 19, 2004, Melcenia Bell was robbed and assaulted. Nearly four months later, on December 12, 2004, Bell died as a result of the complications from the injuries she sustained in the assault. On October 5, 2006, a Hinds County jury convicted Mary Dixon of the robbery and murder of Bell. Thereafter, Dixon filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, for a new trial. Dixon’s motion was denied on January 8, 2007. Aggrieved, Dixon now appeals arguing the following assignments of error: (1) the trial court erred in refusing to suppress Dixon’s statements; (2) the trial court erred in denying Dixon’s motion for a directed verdict, rejecting Dixon’s motion for a judgment notwithstanding the verdict (JNOV), and refusing to grant Dixon’s request for a peremptory jury instruction; and (3) the trial court erred in admitting the testimony of Dr. Stephen Hayne and photographs from the autopsy of Bell.
 

 FACTS
 

 ¶ 2. On the morning of August 19, 2004, shortly after 7:30 a.m., Elizabeth Eubanks arrived at 827 Dreyfus Street, Jackson, Mississippi, the home of Bell, to assist Bell with her personal needs and carry out some household chores as Eubanks had done every Thursday over the past three years. Shortly after Eubanks arrived, Daryl Bell, the decedent’s son, left home to haul some scrap metal to a recycling center in Flowood, Mississippi. He had plans to return home soon to take his mother to the hairdresser in preparation for a trip to Cleveland, Ohio that Sunday to visit her daughter and grandson. As her usual practice, Eubanks helped Bell pin her wallet in her housecoat after Bell took her bath. Bell, who owned rental property directly behind her home, was known to keep the weekly rental payments in her wallet pinned to her housecoat. On this day Bell had $300 in rental payments as well as $475 from her son to pay for her son’s ticket to Ohio.
 

 ¶ 3. Eubanks testified that she left Bell’s house between 8:45 a.m. and 9:00 a.m. after having placed a Coke on the stand near Bell’s daybed, which was located in the front room of Bell’s home. Eubanks also testified that she (Eubanks) left the front door unlocked so that the Meals on Wheels driver would be able to gain entrance into the house without Bell having to get up. At approximately 9:45 a.m., Jack Turner, the Meals on Wheels driver, arrived at Bell’s home and found her lying naked on the floor in a pool of blood with a screwdriver sticking out of her neck and a bloody axe lying on the daybed. Turner retreated to his vehicle and requested that his dispatcher notify the authorities.
 

 ¶ 4. Approximately, three hours after the assault, Jacqueline Wallace, Tony Edwards, and Dixon, who were all persons of interest in the robbery and assault, were transported to the police department for questioning. Officer Charmaine Valentine testified that while transporting Dixon to the police department, Dixon stated that Edwards killed that old lady. Officer Valentine subsequently relayed this information to the detectives. Detective James Roberts testified that when Dixon arrived at the police department she was
 
 Miran-dized
 
 and then questioned regarding the crime against Bell. Although Dixon did not
 
 *1102
 
 sign a written waiver of rights, she spoke with Detective Roberts. Detective Roberts reduced Dixon’s responses to writing. Thereafter, Dixon initialed each answer and signed the statement. After interviewing Dixon, Detective Roberts testified that he continued his investigation and talked with several other individuals. Detective Roberts stated that during the investigation of this offense, he found no physical evidence to link Dixon to the assault and robbery. Investigator Andrew McGahey testified that latent prints were found on the Coke can, but none of the evidence collected and analyzed linked Dixon to the crime.
 

 ¶ 5. On December 12, 2004, Bell died as a result of complications from her injuries. Approximately five months later, on May 18, 2005, Detective Roberts received a call from Deputy Pamela Turner of the Hinds County Sheriffs Department, who informed him that she had information regarding the robbery and murder of Bell. Deputy Turner testified that she had spoken with Dixon at least four times prior to contacting Detective Roberts and at least two times thereafter. Deputy Turner recalled that on three occasions in which she spoke with Dixon, Dixon confessed to being present and witnessing the robbery and assault of Bell.
 

 ¶ 6. In May 2005, a Hinds County grand jury indicted Dixon for the murder and armed robbery of Bell. During trial, a suppression hearing was held to determine the voluntariness of the statements made by Dixon to Deputy Turner. The trial court ruled that Dixon’s statements that linked her to the scene of the crime were given freely and voluntarily. On October 5, 2006, a jury found Dixon guilty of capital murder. Dixon was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. Aggrieved, Dixon appeals.
 

 ANALYSIS
 

 I. MOTION TO SUPPRESS
 

 ¶ 7. This Court reviews a trial court’s decision to admit or exclude evidence under an abuse of discretion standard.
 
 Graves v. State,
 
 492 So.2d 562, 565 (Miss.1986).
 

 ¶ 8. Dixon argues that the trial court erred in failing to suppress statements which she made to Deputy Turner on May 4, 9, 11, 16, 20, and 25, 2005. Dixon contends that the statements were involuntary and were given without adequate warning or waiver of her fundamental rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Article 3, Sections 14 and 26 of the Mississippi Constitution of 1890. Dixon gave six separate statements to Deputy Turner. All the statements were given while in custody. Deputy Turner testified that Dixon was actually given her
 
 Miranda
 
 warning prior to making the May 9th statement, reminded of her rights pri- or to making the May 11th statement, and in the subsequent statements on May 16th, May 20th, and May 25th, Dixon was either reminded or stated that she understood her rights. In her brief, Dixon contends that according to the Mississippi Law Enforcement Officer’s Handbook, section B.2.a. (2006-2007), as a trained law enforcement officer, Deputy Turner should have been aware that
 
 “Miranda
 
 warnings should have been given prior to any subsequent interrogation session with the person in custody even though the warnings were given in a prior interrogation.”
 

 ¶ 9. On May 4, 2005, Deputy Turner was ordered by her supervisor to speak with a female housed at the Raymond Detention Center, who had pertinent information about drug activity in the Jackson area. The female, who was later identified as
 
 *1103
 
 Mary Dixon, was checked out of the detention center to aid in a drug buy. Deputy Turner testified that while en route to conduct a drug buy, Dixon identified herself as the female that the Jackson Police Department had in custody for hurting Melcenia Bell. After Dixon stated that she witnessed the crime while at the abandoned building next door to Bell’s home, Deputy Turner asked Dixon if they could talk later. Dixon agreed.
 

 ¶ 10. Deputy Turner testified that on May 9, 2005, after receiving permission from Dixon’s attorney, Tom Fortner, to speak with Dixon, Dixon was properly
 
 Mirandized
 
 and signed a
 
 Miranda
 
 waiver before giving a statement. Deputy Turner testified that during the interview, Dixon disclosed pertinent information relating to Bell’s assailant. At the conclusion of the interview, the recording, which was turned over to the division secretary to be transcribed, was found to be inaudible.
 

 ¶ 11. Due to the recording problems on May 9th, Deputy Turner came back on May 11, 2005, and took another statement from Dixon. Dixon stated that while she was at the abandoned building next door to Bell’s home with her crack pipe and dope, she observed Tony Tucker a/k/a Antonio Dixon go to Bell’s home and commit the crime.
 

 ¶ 12. On May 16, 2005, Dixon agreed to take a polygraph test, but shortly after beginning the process, Dixon declined. In an effort to understand Dixon’s refusal to take the polygraph test, Deputy Turner took Dixon outside to smoke a cigarette. Deputy Turner allowed Dixon to use her cell phone to call her daughters. At the end of the call, Dixon began to cry. Deputy Turner inquired as to what was wrong, and Dixon responded that she wanted to tell the truth. Dixon stated that she was on Bell’s porch inside the doorway the day of the incident watching Tucker hurt Bell. Thereafter, Dixon stated that she did not want to talk anymore, but she was willing to talk later.
 

 ¶ 13. Deputy Turner testified that on May 20, 2005, she checked Dixon out of jail, drove her to McDonald’s to eat and then to Bell’s home before interviewing Dixon again about the robbery and assault of Bell. Deputy Turner testified that after reminding Dixon of her
 
 Miranda
 
 rights, Dixon stated in a recorded interview that she was on Bell’s porch, in the doorway smoking crack when Tucker assaulted and robbed Bell. Dixon gave a description of Bell’s clothing, the location of the money, as well as a detailed description of how the crime was committed.
 

 ¶ 14. Deputy Turner testified that on May 25, 2005, Dixon identified Tucker in a lineup as Bell’s assailant. No additional statements were made after the identification. Dixon was neither advised of her
 
 Miranda
 
 rights nor was a waiver signed.
 

 ¶ 15. “A statement by the accused is admissible if the accused was given the
 
 Miranda
 
 warnings, and then knowingly, intelligently, and voluntarily waived the rights.”
 
 Busick v. State,
 
 906 So.2d 846, 855(¶ 16) (Miss.Ct.App.2005) (citation omitted). “The voluntariness of a waiver, or of a confession, is a factual inquiry that must be determined by the trial judge from the totality of the circumstances.”
 
 Hicks v. State,
 
 812 So.2d 179, 191(¶ 32) (Miss.2002).
 

 ¶ 16. “[T]he judge should ascertain, under a totality of the circumstances and beyond a reasonable doubt, that the defendant’s statement was freely and voluntarily given, and was not the result of force, threat, or intimidation.”
 
 Baldwin v. State,
 
 757 So.2d 227, 234-35(¶ 28) (Miss.2000). “Determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied
 
 *1104
 
 an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence.”
 
 Hicks,
 
 812 So.2d at 191(¶ 32).
 

 ¶ 17. In
 
 Morris v. State,
 
 798 So.2d 603, 606(¶ 9) (Miss.Ct.App.2001), this Court stated:
 

 When a defendant challenges the volun-tariness of his statement, the trial court must hold an evidentiary hearing outside the jury’s presence to determine the admissibility of the confession. The State must prove the voluntariness of the statement beyond a reasonable doubt. The State establishes a prima facie case of voluntariness when the officer, or other person having knowledge of the facts, testifies that the confession was voluntarily made without any threats, coercion, or offer of reward. When the State establishes its prima facie case of voluntariness, the defendant must then rebut the State’s assertion of voluntariness.
 

 (Internal citations and quotations omitted).
 

 ¶ 18. A suppression hearing was conducted prior to Deputy Turner’s testimony in order to exclude the six statements Dixon made to Deputy Turner. The trial court ruled that the May 4th statement and the May 25th statement did not fall within the definition of a confession. The trial court held that although Dixon was read her
 
 Miranda
 
 rights on May 9th, the statement given was not a confession, nor was there any evidence to suggest that the statement made was not a knowing, intelligent, and voluntary statement. Dixon alleges that she is functionally illiterate; therefore, she lacked the ability to understand a waiver of her rights. However, testimony from both Detective Roberts and Deputy Turner indicated that she understood her rights. As to the May 11th statement, the trial court ruled that although it was not satisfied that what Dixon said fell within the definition of a confession, even if it did,
 
 Miranda
 
 rights are only factors for the court to consider when determining whether or not, from the totality
 
 of
 
 the circumstances, that the statement given by one in custody is a voluntary statement. The trial court ruled that although the facts and circumstances surrounding the May 16th statement were lacking, the factors and qualifications required under the law for a statement to be admissible were met. The trial judge also ruled that Dixon’s statement on May 20, 2005, was freely and voluntarily given.
 

 ¶ 19. On each of the aforementioned dates, Dixon spoke with law enforcement officials and stated that she was either present at the scene of the crime or witnessed the crime being committed against Bell. During each of the statements, Dixon either gave a statement after waiving her Miranda rights or continued to disclose information after being reminded of her rights. There is no evidence to suggest that Dixon requested counsel before making any statement to law enforcement. Moreover, Dixon presented no evidence to suggest that her statements were not voluntary. In addition, Dixon’s willingness to continue previous conversations with Deputy Turner as to what happened implies that Dixon freely and voluntarily made the statements.
 

 ¶ 20. The trial judge did not abuse his discretion in denying Dixon’s motion to suppress the statements made to Deputy Turner. Thus, we find this issue is without merit.
 

 II. MOTION FOR A DIRECTED VERDICT, MOTION FOR A JUDGMENT NOTWITHSTANDING THE VERDICT, AND REQUEST FOR A PEREMPTORY JURY INSTRUCTION
 

 
 *1105
 
 ¶ 21. The standard of review applied to a denial of a request for peremptory instructions, motions for a directed verdict, and motions for a judgment notwithstanding the verdict is the same.
 
 Easter v. State,
 
 878 So.2d 10, 21(¶ 36) (Miss.2004). Each of them challenges the legal sufficiency of the evidence presented at trial.
 
 Id.
 
 In considering whether to disturb a jury verdict our supreme court will consider:
 

 whether the evidence shows “beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.” The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
 

 Stewart v. State,
 
 986 So.2d 304, 308(¶ 12) (Miss.2008).
 

 ¶ 22. Dixon maintains that the State failed to prove by sufficient evidence the necessary elements of capital murder pursuant to Mississippi Code Annotated section 97—3—19(2)(e) (Rev.2006), which states:
 

 The killing of a human being without the authority of law by any means or in any manner shall be capital murder ... [wjhen done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies[.]
 

 ¶ 23. Dixon specifically argues that there was no physical evidence to link her to the robbery and assault resulting in Bell’s death. Dixon asserts that although witnesses testified that the scene of the crime was very bloody, no blood stains were discovered on the clothing that she had worn that day. Dixon argues that the State failed to prove beyond a reasonable doubt that she did kill Bell without authority of law while engaged in the commission of the crime of robbery as required pursuant to Mississippi Code Annotated section 97—3—19(2)(e).
 

 ¶24. Detective Roberts testified that none of the information surrounding the crime had been released to the public. The only person(s) besides the person committing the crime who had significant knowledge of the crime scene were Turner, the Meals on Wheels driver; law enforcement; crime scene personnel; and medical personnel. Deputy Turner testified that although Dixon alleged that Tucker had committed the crime, on May 20, 2005, Dixon was able to provide an accurate description of how the assault occurred, a description of Bell’s clothing, and the location of Bell’s wallet where Bell kept her money.
 

 ¶ 25. Charmaine Kelly testified that in October 2005, she wrote a letter to the district attorney informing the State of Dixon’s involvement in the crime against Bell. Kelly, who was Dixon’s cellmate on two occasions, testified that during their incarceration, Dixon confessed to the robbery and assault against Bell. Kelly also testified that Dixon told her that after committing the crime, she bought drugs with Tucker. Kelly stated that Dixon said she left Bell naked to make it appear as if a man had committed the crime.
 

 ¶ 26. Gladys Powell a/k/a Denise Bates, a former coworker of Dixon, testified that in response to her question as to whether Dixon committed the offense against Bell, Dixon responded, “if they said she did it, then she did it.” Powell claims that at no
 
 *1106
 
 point during their conversation did Dixon deny having killed Bell.
 

 ¶ 27. “[(Questions regarding weight and worth of witness testimony or witness credibility are for the jury to settle.”
 
 Jones v. State,
 
 788 So.2d 771, 778(¶ 19) (Miss.Ct.App.2000). The Mississippi Supreme Court has stated:
 

 Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject, the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into findings of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict.
 

 Jones v. State,
 
 920 So.2d 465, 472-73(¶ 22) (Miss.2006) (citation omitted).
 

 ¶ 28. The jury in this case has found that the evidence was sufficient to convict Dixon on the offenses for which she was indicted. In making its determination whether to find Dixon guilty or innocent, the jury resolved any issues of credibility of the witnesses presented at trial and, thus, found it reasonable to accept their representation of the facts.
 

 ¶ 29. Therefore, viewing the evidence in the light most favorable to the prosecution, the trial court did not err in denying Dixon’s motion for a directed verdict, motion for a judgment notwithstanding the verdict, and request for a peremptory jury instruction. We find that this issue is without merit.
 

 III. TESTIMONY OF DR. STEPHEN HAYNE AND AUTOPSY PHOTOGRAPHS OF THE DECEDENT
 

 ¶ 30. Exhibits 36, 38, 40, and 42 were marked for identification only. Exhibits 37, 39, 41, 43, and 44 were admitted into evidence.
 

 ¶ 31. Dixon contends that the use of Exhibits 38, 40, and 42 was in error, and when coupled with other errors, the exhibits deprived Dixon of a fair trial free of inflammatory prejudice. Dixon argues that the photographs were not necessary to identify Bell because Eubanks and Daryl had done so earlier in trial. Dixon asserts that Exhibits 37, 39, 41, 43, and 44 were merely admitted to horrify the jurors at the brutality of a crime against one so vulnerable as Bell. Dixon claims that Exhibits 43 and 44 were irrelevant to testimony as to the cause of Bell’s death because Bell’s medical records indicated there were no stab wounds on her right side depicted in the picture and, thus, inadmissible. However, in her rebuttal brief, Dixon asserts that although Exhibits 37, 39, 41, 43, and 44 are relevant. Dr. Hayne used the aforementioned exhibits to explain that Bell’s death was the result of multiple organ failure, and the scars Bell sustained were consistent with being stabbed.
 

 ¶ 32. Exhibit 37 is a facial view of decedent Bell. This photograph depicts a large scar located over the left side of the forehead. Exhibit 39 is a photograph of decedent Bell’s left upper extremity, showing part of the left arm and left forearm with multiple scars predominantly located over the outer surface of the left arm. Exhibit 41 is a photograph of the left flank or outer flank left chest wall of decedent Bell. There are multiple scars, some medical in origin, located over the site going up to the front surface of the left shoulder. Exhibit 43 is a photograph of the outer surface of the right upper extremity including the
 
 *1107
 
 right shoulder, right arm, and upper part of the right forearm. There are multiple scars on the site as well as the shoulder and right arm. Exhibit 44 is a photograph of the thumb, part of the back, and the second digit of the right hand.
 

 ¶ 33. The supreme court has held: Photographs that aid in describing the circumstances of the killing, the location of the body and cause of death, or that supplement or clarify a witness’s testimony have evidentiary value and are admissible before a jury. Admission of photos of a deceased is within the sound discretion of a trial court and is proper so long as the photos serve some useful, evidentiary purpose. The discretion of a trial judge to admit photos in criminal cases, runs toward almost unlimited admissibility regardless of gruesomeness, repetitiveness, and the extenuation of probative value.
 

 Bennett v. State,
 
 933 So.2d 930, 946(¶ 53) (Miss.2006) (internal citations and quotations omitted). “Some probative value is the only requirement needed in order to support a trial judge’s decision to admit photographs into evidence.”
 
 Jones,
 
 920 So.2d at 476-77(¶ 35) (citation omitted).
 

 ¶ 34. “[Ajbsent an abuse of discretion, the [trial] court’s decision [as to the admissibility of photographs] will be upheld on appeal.... Reversal of the trial court will occur only where there is a clear abuse of discretion.”
 
 Id.
 
 at 476(¶ 35).
 

 ¶ 35. Prior to direct examination of Dr. Hayne, the trial judge conducted a hearing outside the presence of the jury, which was treated as a motion in limine to address the matter of the photographs. During the hearing, defense counsel objected to the inflammatory and prejudicial nature of the photographs, but made no objections as to the relevance of the photographs. Defense counsel asserted that at the time of the motion in limine, he could not address the issue of relevance. He contended that he was not aware of how Dr. Hayne reached a conclusion as to the scars depicted in the photographs or what he intended to show by the photographs. Dixon asserts that testimony had been given as to the number of scars and Dr. Hayne’s inability to identify the origin of the scars. As a result of the hearing, the trial court ruled that as the trial progressed, defense counsel could make timely objections as to the relevancy of the photographs. Later after the jury returned, defense counsel objected only to the relevancy of Exhibits 36 and 38. The trial court sustained the objection and allowed the Exhibits 36 and 38 to be received and marked for identification only.
 

 ¶ 36. As the trial progressed, defense counsel made no additional objections as to the relevancy or the inflammatory nature of Exhibits 37, 39, 41, 43, and 44. Being within his sound discretion, the trial judge found that the photographs served some probative value; therefore, the photographs were deemed admissible. Dixon presented no evidence that the trial court abused its discretion; thus, we find that this assignment of error is without merit.
 

 ¶ 37. Next, Dixon argues that Dr. Hayne was forced to acknowledge the inconsistency of his testimony. Dixon contends that Dr. Hayne concluded that scars in Exhibits 43 and 44 were on the right side of the body and were consistent with the type of injuries that would be received in this type of attack, while the medical records showed that none of the stab wounds were on the right side of the body. In addition, Dixon contends that Dr. Hayne could not specify the origin of the scars, and his testimony was inconsistent with emergency room records; therefore, it was error to permit Dr. Hayne’s testimony and admission of the exhibits. How
 
 *1108
 
 ever, the State asserts that Dixon failed to contemporaneously object to Dr. Hayne’s testimony. Therefore, the State asserts that Dixon is procedurally barred.
 

 ¶ 38. Pursuant to Mississippi Rule of Evidence 702:
 

 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
 

 “According to Mississippi Rule of Evidence 703, the expert may base his opinion on personal observation as well as facts or data ‘made known to him at or before the hearing.’ All evidence must also pass the requirements of Mississippi Rule of Evidence 403, which excludes evidence if it is unfairly prejudicial, confusing, or a waste of time.”
 
 Ross v. State,
 
 883 So.2d 1181, 1184(¶ 4) (Miss.Ct.App.2004). “A forensic pathologist, addresses two basic questions: what was the cause of death, and what was the manner of death?”
 
 Bell v. State,
 
 725 So.2d 836, 853-54(¶ 51) (Miss.1998).
 

 ¶ 39. The State offered Dr. Hayne to testify to as to Bell’s cause of death. Dr. Hayne was tendered as an expert witness in the areas of anatomic, clinical, and forensic pathology. Dr. Hayne was deemed qualified to provide expert testimony regarding the interpretation of laboratory tests, prepare tissues or specimens to make a determination of disease or lack thereof, and to determine the cause and manner of death.
 

 ¶ 40. Dixon’s argument as to the inconsistency of Dr. Hayne’s testimony and review of the photographs is flawed. Dr. Hayne’s testimony was based on his observation of the body, facts made known to him, and his observation of anatomical drawings and photographs at trial. Dr. Hayne testified that he had reviewed Bell’s medical records and was able to reach an opinion with a reasonable degree of medical certainty as to the cause and manner of Bell’s death. Dr. Hayne’s testimony fulfilled the requirements as outlined in
 
 Ross.
 

 ¶ 41. Nevertheless, “if no contemporaneous objection to a witness’s testimony is made, the error, if any, is waived. Application of the contemporaneous objection rule is not diminished in a capital case.”
 
 Rubenstein v. State,
 
 941 So.2d 735, 751(¶ 27) (Miss.2006) (internal citation omitted). Dixon made no objections as to Dr. Hayne’s qualifications as an expert witness or testimony. Therefore, this issue is procedurally barred and without merit.
 

 ¶ 42. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
 

 LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ, CONCUR.